## Commonwealth v. Thompson

*Donna Zucker, assistant district attorney,* for the commonwealth.

*John Packel,* for defendant.

SHEPPARD, *J.*, April 3, 1989 — This opinion is submitted relative to cross-appeals of this court's arrest of judgment as to the rape verdict and judgment of sentence as to the two remaining charges.

These cross-appeals will be discussed separately in this opinion. For the reasons set forth, both appeals should be denied and the judgment affirmed.

## HISTORY OF CASE

On November 3, 1988, following a four-day trial, a jury found defendant guilty of rape, corrupting the morals of a minor, and indecent assault. Post-verdict motions were timely filed and following a comprehensive hearing on January 27, 1989, this court arrested judgment on the rape and denied defendant's remaining motions.[1] Defendant was then sentenced to a term of imprisonment of two and one-half to five years for corrupting the morals of a minor, and a consecutive term of one to two years for indecent assault. These cross-appeals followed.

## FACTS

The relevant facts adduced at trial may be briefly summarized.

In 1986, complainant, Marie Moses, was residing with her father, Reginald Thompson, her mother, and her younger sister at 4505 Fairmount Avenue in Philadelphia. At the time of the complained-of incidents Marie was 12 years old. She testified that during the summer months of 1986, defendant had been molesting her. On two different evenings,

---

1. As discussed *infra,* the transcript of the January 27, 1989 hearing pertinent to deferred matters is incorporated by reference in this opinion pursuant to Pa.R.A.P. 1925(a).

having been asleep, she awoke to feel the defendant groping at her legs on one occasion and touching her vagina on another. On a third occasion she awoke to the sensation of this "white stuff on my legs and my sheet."

The fourth incident (which is the focus of the commonwealth's appeal) took place on January 25, 1987, in Marie's bedroom in the family home. At that time, Marie was sleeping and awoke to find defendant on top of her and his penis moving in and out of her vagina. Defendant told Marie that she looked like her mom, and that he would not hurt her. Marie immediately attempted to rise, but could not because defendant's legs were over her legs. Marie stated, "[T]he way that I jumped up, that I couldn't get up because of the way he had his legs over me. And so he got up, because he was nervous because my mom was in the room . . . in her room."

In testimony elicited during cross-examination, Marie stated that she awoke with defendant on top of her and could feel his penis inside of her. She "went to lean up, [and] when [she] couldn't get all the way up," she proceeded to push him off. She was then asked, "[A]nd then did he get up?" She answered, "Yes." In response to the question, "[A]fter you woke up, did he get off you right away?" Marie answered, "Yes he did."

The balance of testimony from Marie and other witnesses addressed: (a) the reporting of the incident to Marie's aunt, (b) the investigation by the Philadelphia Sex Crimes Unit, (c) the Philadelphia County Department of Human Services investigation, and a physical examination by a doctor.

## DISCUSSION

### *The Commonwealth Appeal of the Arrest of Judgement of the Rape Verdict*

The first portion of this opinion will address the commonwealth's appeal at no. 00616 Philadelphia 1989.

At the outset and crucial to an understanding of the issue presented, it must be stressed that the commonwealth *did not proceed* at trial *on that subsection* of the rape statute *covering* an *unconscious victim* (18 Pa.C.S. §3121(3)). This fact was both puzzling to, and exasperating for this court and, indeed, had the commonwealth not made such a serious mistake there would be no issue in dispute.[2]

Given the counts on which the commonwealth proceeded at trial, the issue presented can be briefly stated.

Was there sufficient evidence to support a conviction for rape by "forcible compulsion" or "threat of forcible compulsion" under 18 Pa.C.S. §§3121(1) or (2), where the victim was asleep at the time of penetration and the defendant ceased the intercourse and disengaged when the victim awoke?[3]

---

2. A true copy of the reverse side of the pertinent bill (8705-0241) was attached to this opinion as exhibit "A."

As is evident on exhibit "A," the counts presented at trial contained all of the rape statute subsections except that one dealing with an unconscious victim [18 Pa.C.S. §3121(3)]. This section (the third count) was stricken by the commonwealth at the charging stage prior to trial, and the trial prosecutor (who, apparently, had *not* been involved in making this decision) could offer no explanation for it. This procedural faux pas appears to have been a fundamental error which led directly to the issue in this appeal. Had the appropriate subsection (§3121(3)) not been stricken, there would have been no question but that this defendant was guilty under that portion of the rape statute.

3. This case presents an issue of first impression in this commonwealth under the existing rape statute.

This court submits that the evidence was insufficient to support a conviction for rape by "forcible compulsion" because the victim was asleep when penetration occurred[4] and, after the victim awoke, no force or threat of force was exerted to continue or maintain intercourse and *defendant immediately disengaged.* Indeed, even the prosecutor agreed that defendant immediately disengaged.

Analysis of this issue requires a discussion of relevant decisions from this and other jurisdictions, as well as an inquiry into the legislative history of 18 Pa.C.S. §3121. Consideration of decisional precedents, the legislative history, and this court's obligation to construe strictly this criminal statute, led the undersigned to arrest judgment on the rape verdict. This was a difficult and discomforting decision in light of the egregious and reprehensible conduct involved here, and was made only after exhaustive research and long and serious contemplation.[5]

---

4. This court made clear during the trial that this case did *not* involve the moral, intellectual, or psychological force enumerated in *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986). Certainly, for a victim to submit to the nature of the forces which concerned the *Rhodes* court, the victim, of necessity, would have had to have been conscious, awake and alert. Therefore, *Rhodes,* its progeny, and the attendant issues are not germane and will not be discussed. However, *Rhodes* is helpful in its preliminary analysis of "force," as that concept is defined and analyzed within the framework of the Pennsylvania rape statute. See discussion *infra.*

5. Much of the following analysis was summarized at the January 27, 1989 hearing when post-verdict motions were considered. The relevant portion of that transcript is incorporated herein pursuant to Pa.R.A.P. 1925(a).

## (I) Decisions Involving Illegal Sexual Conduct With a Sleeping Victim

This court could find no Pennsylvania case on point; however, there are a limited number of jurisdictions which have recently considered analogous situations in the light of modern sexual assault statutes.[6]

### (a) The North Carolina Case

In *State v. Moorman,* 82 N.C. App. 594, 347 S.E.2d 857 (1986), rev'd 320 N.C. 387, 358 S.E.2d 502 (1987), the North Carolina courts considered a somewhat analogous case. In *Moorman,* a woman returned to her college dormitory room and fell asleep. Later, a man entered the room. The victim awoke to find him on top of her engaging in vaginal intercourse. The woman tried to sit up, but the man grabbed her by the throat and pushed her back to the bed, causing multiple scratches on her neck. The woman, fearing injury, offered no further resistance. The man ejaculated, and then engaged in deviate sexual intercourse which created a one-half inch tear in her anus.[7] *Moorman, supra,* 347 S.E.2d at 859.

Suprisingly, when the defendant was brought to trial, the North Carolina court was presented with an indictment containing a deficiency similar to

6. Research by this court found recent, pertinent decisions in three jurisdictions: North Carolina, California and Michigan.

7. It must be noted that in *Moorman* the perpetrator did, in fact, exert force and the threat of force to maintain and continue his illegal sexual conduct after the victim awoke. To that extent, *Moorman, supra,* is distinguishable from this case.

that in this case.[8] The applicable North Carolina rape statute, N.C. Gen. Stat. §14-27.3, provided:

"(a) A person is guilty of rape in the second degree if the person engaged in vaginal intercourse with another person:

"(1) by force or against the will of another person; or

"(2) who is . . . physically helpless, and the person performing the act knows or should reasonably know the other person is physically helpless."

"Physically helpless" was defined in N.C. Gen. Stat. §14-27.1(3) as "(i) a victim who is unconscious; (ii) a victim who is physically unable to resist . . . or communicate an unwillingness to submit . . . " 347 S.E.2d at 859. The indictment in *Moorman* gave notice to a violation of section (a)(1), but did not charge a violation of (a)(2), the subsection which dealt with physically helpless victims. Moorman was convicted of rape in the trial court, and appealed.

The North Carolina Court of Appeals characterized the disparity between the facts and the indictment as "a fatal variance." 347 S.E.2d at 859. The court held the indictment improper because it did not specify the "physically helpless" section of the statute. Based on this procedural flaw and the facts presented, the court arrested the rape verdict, holding that the evidence was insufficient.

The Supreme Court of North Carolina reversed in *State v. Moorman,* 320 N.C. 387, 358 S.E.2d 502 (1987), holding that force was implied in law and the conviction was proper under N.C. Gen. Stat. §14-27.3(a)(1). In reaching this conclusion, the court found persuasive the prior common law which held that a rape occurred when sexual intercourse was achieved by force, without consent, or where the victim was asleep or otherwise unable to give

8. See discussion at footnote 2, *supra.*

consent.[9] Thus, the court believed that the common law implied force and lack of consent, which made the crime of rape complete upon the mere showing of sexual intercourse with a sleeping person.

The court further found that the common law was assimilated into that state's statutes, holding:

"In the case of a sleeping victim, it makes no difference whether the indictment alleges that the vaginal intercourse was by force and against the victim's will or whether it alleges merely the vaginal intercourse with an incapacitated victim. In such case sexual intercourse with a victim is ipso facto rape because the force and lack of consent are *implied in law." State v. Moorman, supra,* at 506. (emphasis supplied)

The undersigned submits that this notion, i.e., that the force is implied in law, amounts to an impermissible leap in logic. Under this rationale, an offender could violate a sleeping victim, withdraw and leave without awakening the victim, and still be convicted of rape by forcible compulsion. Certainly, the lack of consent may be implied in law because the woman never did manifest consent. On the other hand, implying the force in law, when the victim never knew of the intercourse, never protested, and never was subdued by force or threat of

9. The cited authority for this characterization of the common law included: *State v. Hines,* 286 N.C. 377, 211 S.E.2d 201 (1975); *State v. Burns,* 287 N.C. 102, 214 S.E.2d 56, cert. denied, 423 U.S. 933, 96 S.Ct. 288, 46 L.Ed. 264 (1975); *Harvey v. State,* 53 Ark. 425, 14 S.W. 645 (1890); *Brown v. State,* 138 Ga. 814, 76 S.E. 379 (1912); *Territory of Hawaii v. Tastud Noguchi,* 38 Haw. 350 (1949); *State v. Lung,* 21 Nev. 209, 28 P. 235 (1891); *Payne v. State,* 40 Tex. Crim. 202, 29 S.W. 604 (1899); 75 C.J.S. Rape §11 (1952); Wharton's Criminal Law §289 (1978).

force, is unwarranted in the face of specific statutory provisions tailored to fit specific circumstances.

Interestingly, this unwarranted holding was not necessary in light of the facts in *Moorman*. That defendant, after the victim awoke and was aware of the coupling, brutally thrust the victim down with sufficient force to bruise her neck. He then sodomized her with sufficient force to tear her anus. This is the force clearly present in *Moorman*, and its acknowledged existence would have provided a more rational basis for reversal.[10]

The evidence of force present in *Moorman* is conspicuously absent in the case at bar. This defendant did not exert any force after Marie awoke, nor did he physically injure her in any manner, nor did he threaten her. Instead, unlike *Moorman*, this defendant ceased copulation immediately and disengaged when Marie awoke.

These factual differences render *Moorman, supra*, distinguishable. Furthermore, for the reasons discussed below, this court does not subscribe to that reasoning which implies force as a matter of law.

## (b) The California Case

In *People v. Kusomoto*, 169 Cal. App. 3d 487, 215 Cal. Rptr. 347 (1985), the California Court of Appeals reached a result contrary to the holding in *Moorman, supra*. *People v. Kusomoto, supra*, involved a defendant who inserted his finger in the vagina of his sleeping stepdaughter. The daughter

---

10. The North Carolina Supreme Court did state that there was evidence to support a conviction of rape by force. However that court did not discuss this evidence, rather it found that, in any event, force was implied in law.

This court discussed both *Moorman* decisions at length during the January 27, 1989 hearing relevant to post-trial motions.

awoke, reproached the defendant and left the room. The essential and analogous fact is that when the daughter awoke, the penetration terminated.

On appeal, the defendant challenged his conviction under the California rape-by-object statute subsection dealing with force.[11] He argued that there was insufficient evidence of force, contending that, since he did not physically subdue or threaten the girl, penetration was not facilitated by force.

The *Kusomoto* court, after analyzing California's other sexual assault statutes including the legislative employment of the term "force,"[12] concluded that "the legislature did not intend the performance of acts on a sleeping victim to be by means of force as the term appears in other subdivisions of those same statutes."[13] Next, the *Kusomoto* court determined that the rape-by-object statute (section 289) was not intended to require a definition of "force" broader than its meaning in other sex-crime statutes. By surveying the concept of force at common law which defined rape as unlawful sexual intercourse with a female person against her will or consent, the court concluded that force in the pre-statutory scheme was evidentiary support man-

11. California's rape-by-object statute, Cal. Penal Code §289(a), provides for *forcible* rape by object. Section 289(b) speaks to situations where the victim is unable to consent.

Additionally, California's other sexual assault crimes have separate and specific subsections dealing with unconscious victims, which have been interpreted to include sleeping persons.

12. The court studied sections 261(2) rape by force or fear, (1) victim incapable of giving consent, and (4) victim is unconscious of the nature of the act; and sections 286, 288 sodomy and oral copulation: (c) by force, (g) a victim incapable of giving consent, and (f) victim unconscious of the nature of the act.

13. 160 Cal. App. at 492, 215 Cal Rptr. at 350.

ifesting that the intercourse was against the victim's will. The common-law concept of rape, according to the California court, primarily guarded a woman's will and the privacy of her sexuality against non-consensual intercourse. The essence of the crime was the violation of the woman's will and sexuality, and force did not have to result in physical harm. Force merely demonstrated the non-consensual element of the crime. Citing, *People v. Cicero,* 157 Cal. App. 3d 465, 204 Cal. Rptr. 582 (1984).

Stressing that they were faced not with a common-law crime, but an act proscribed by statute, the *Kusomoto* court reasoned that an interpretation of the statute which assigned only an evidentiary role to the concept of force would render the force requirement of the statute superfluous. Thus, the *Kusomoto* court said:

"In the final analysis we have no question here that the defendant perpetrated an act to which the victim did not consent. But given the entire statutory scheme, the requirement of 'force' in section 289(a) simply cannot be stretched to encompass the type of conduct involved in this case, where the victim was penetrated while asleep and where the victim's will was not overcome by any physical force substantially different from or greater than that necessary to accomplish the act itself. . . . " 169 Cal. App. 3d at 495, 215 Cal. Rptr. at 351. This statement illustrates the precise reasoning which led this court to arrest judgment in the instant case.

### (c) The Michigan Case

Similar reasoning was applied by the Supreme Court of Michigan in *People v. Patterson,* 428 Mich. 502, 410 N.W.2d 733 (1987). In *Patterson,* a teenage girl awoke to the sensation of a hand on her genitals.

She called out "who is it?" and reached out to feel an unshaven face above her. After turning on the light, she confronted the molester, and told him to get out of her house. The man left. The defendant was charged with fourth degree criminal sexual conduct. The relevant statute, Mich. Comp. Laws §750.520(e), (Mich. Stat. Ann. §27.788(5)), provided:

"520(e)(1). A person is guilty of criminal sexual conduct in the fourth degree if he or she engages in sexual contact with another person and if either of the following exist:

"(a) force or coercion is used to accomplish the sexual contact. Force or coercion includes but is not limited to any of the circumstances listed in section 502(b)(1)(f)(i) to (iv);

"(b) the actor knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless."

Section 502(b)(1)(f)(i) to (iv) defined force as physical force or violence, threats of force or violence, future retaliation such as physical punishment, extortion or kidnapping, and medical examinations which are unethical.

The defendant was charged under subsection (1)(a) of the statute. He was convicted by a jury and appealed. The Michigan Court of Appeals reversed, holding that the evidence was insufficient to support a conviction. The state appealed.

The Supreme Court remanded, holding that the element of force was *not* proven and the conviction should be reduced to simple battery. In reaching this decision, the Michigan Supreme Court followed reasoning similar to *Kusomoto*.

First, the Michigan court reviewed the legislative history of the fourth degree sexual assault statute. The final statute contained a section which speci-

fied that criminal sexual conduct could be established if the victim were physically helpless. "Physically helpless" was defined to mean persons unconscious or asleep. [Mich. Comp. Laws §750.520(a)(i); Mich. Stat. Ann. 28.788(1)(i)]. It was significant to the court that this subsection of the statute dealing with sleeping victims was separate and distinct from the subsection covering force and coercion. The *Patterson* court thus concluded that the legislature intended to treat sexual assault facilitated by force separately from an assault on a physically helpless victim.

Central to this conclusion was the strict construction of criminal statutes required by *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). Also essential was the fact that an interpretation of the defendant's conduct, placing it within the ambit of subsection (1)(a) dealing with force, would operate to nullify subsection (1)(b). This concern led the court to hold: "We decline to expand the definition of force or coercion to include defendant's conduct in this case." 410 N.W.2d at 743.

The undersigned submits that the California and Michigan decisions are better reasoned than the decision of the North Carolina Supreme Court and should be followed absent a countervailing reason arising from analysis of the legislative history of the Pennsylvania rape statute or from other Pennsylvania cases which turned on the concept of force as an element of the crime charged.

### (II) *The Legislative History of the Pennsylvania Rape Statute*

We turn then to the Pennsylvania rape statute, 18 Pa.C.S. §3121, and its common-law predecessor to determine how it bears on the instant issue. To this

end, we have traced the crime of rape in this commonwealth back to the time when its definition was imported from England. One of the earliest definitions appears in 13 Edw. I, Stat. Westm. 2. ch. 34 which provided: "that if a man from henceforth do ravish a woman . . . where she did not consent, neither before or after, he shall have judgment of life and of member. (2) And likewise where a man ravisheth a woman . . . with force, although she consent after, he shall have such judgment as before is said. . . . "[14]

Such definitions evolved and eventually coalesced into our common law. The common-law definition promulgated in Pennsylvania in 1860 stated that rape was "unlawful carnal knowledge of a woman, forcibly and against her will," (see Act of March 31, 1860, P.L. 382, §91, as amended by the Act of May 19, 1887, P.L. 128 §1, (18 P.S. §2261)). The Penal Code Act of June 24, 1939, P.L. 872, §721 (18 P.S. §4721) embodied this same definition, which was essentially the common-law definition as set down by Blackstone.[15]

These definitions were molded into their present form in 1972[16] when the Pennsylvania legislature adopted a modified version of Model Penal Code §213.1 dealing with rape. See 10 Uniform Laws Annotated Master Edition. This provision was enacted

---

14. See Statutes at Large, vol. 1, p. 101, cited in *Commonwealth v. Stephens,* 143 Pa. Super. 394, 17 A.2d 919 (1941). It is interesting to note that even this archaic law, circa 1275, there was a distinction drawn between rape by force and rape in situations where there was a lack of consent.

15. See 2 Sharwood's Blackstone Comm. 209, *Commonwealth v. Stephens, supra.*

16. Act of December 6, 1972, P.L. 1482, effective June 6, 1973.

in its modified form·as 18 Pa.C.S. §3121(1) to (4), and is the statute under scrutiny here.

Significantly, neither the legislative history pertinent to 18 Pa.C.S. §3121,[17] nor the· commentary relevant to the Model Penal Code §213.1,[18] contains a specific reference to the distinction, if any, to be made between the statutory provisions regarding force and/or an unconscious victim, as they should pertain to a sleeping victim. Conspicuously absent is any suggestion that "force" is to be implied in law. Thus, there is no specific legislative history controlling with respect to the resolution of the issue at hand.

### (III) *Pennsylvania Decisions Involving the Pre-1972 Rape Statutes*

During the period while this legislative metamorphosis was taking place, courts were interpreting the earlier statutes. For example, ·in *Commonwealth v. Stephens,* 143 Pa. Super. 394, 17 A.2d 919 (1941), the Superior Court considered a situation where the defendant had intercourse with a woman he knew to be insane. After analyzing earlier definitions of rape at common law and prior decisions, the court stated that an act of intercourse "is against the woman's will

17. See Senate Bill 455, Session of the General Assembly of Pennsylvania 1971, Printer's nos. 470, 1379, 1971 and 2106, compiled in Pennsylvania Senate Bills, sessions 1971-72, nos. 455-460, C.2.

See 1972 Legislative Journal, p. 1040. Senate Bill no. 455, Printer's no. 2106, embodies the rape statute in its present form. Additional remarks appear in 1984 Legislative Journal, p. 2417, concerning House Bill no. 281, Printer's no. 3731.

See also, "Official Comment — 1972" and "Historical Note" for the present 18 Pa.C.S. §3121.

18. See *American Law Institute, Model Penal Code and Commentaries,* Part II §§210.0 to 213.6.

when, from any cause, she is not in a position to exercise judgment about the matter."

The *Stephens* court then concluded that intercourse with a woman who is unconscious due to sleep or drugs or intoxication constituted rape. Such was also true when the inability to consent was due to insanity.

In *Stephens,* the defendant had argued that the intercourse was not forcible because he had not used force or violence to complete the act. In answering this contention, the court said:

"In our opinion the applicable rule is that carnal knowledge of a woman who is incapable through unsoundness of mind . . . of giving rational legal consent, is against her will, and is rape where the actor knows of such incompetency. A man who, knowing of a woman's insanity, takes advantage of her helpless condition . . . is guilty of felonious rape, though he uses no more force than that involved in the carnal act."

The defendant had also argued that the indictment charged a forcible rape while the evidence proved only copulation with an insane victim. In dismissing this argument, the court found that common-law rape could be committed in several ways, and it was not necessary to set out the means or method in the indictment. The court reasoned that "[A] forcible ravishment is one done against a woman's will; if it is done against her will, it is of necessity without her consent . . . if she is too weak of mind to give rational consent, then it follows that she has been forcibly ravished."

Based on this conclusion, the indictment under the then-prevailing definition of rape was sufficient in that it properly notified the defendant what was required to be answered. Thus, the *Stephens* court, presaging the holding of the North Carolina Su-

preme Court in *Moorman, supra,* believed that force in that situation could be constructive. The only force necessary was that which was used to accomplish penetration.

This constructive or implied force doctrine was reiterated by the Superior Court in *Commonwealth v. Brown,* 184 Pa. Super. 494, 136 A.2d 138 (1957). *Brown* involved a defendant who had sexual relations with his paramour's 16-year-old daughter.

The court held that the evidence was insufficient to establish that the intercourse was against the girl's will, since there was testimony at trial showing that she had consented. Thus, the *Brown* court remanded with directions to enter a conviction for fornication.

Pertinent to the instant analysis, however, in dicta, the court briefly surveyed the relevant rape law then extant, and concluded that force was constructive or implied when intercourse was perpetrated upon a sleeping or unconscious woman. See *Commonwealth v. Brown, supra,* citing *Commonwealth v. Stephens, supra.*

This court believes that these cases are distinguishable and that their reasoning, which implies force in law or finds constructive force, should not be deemed controlling under the present statute. Both *Stephens* and *Brown* considered rape as defined under common law and were decided before 18 Pa.C.S. §3121 was enacted. Since the legislature has since codified the rape statute and provided discrete and specifically tailored subsections to address specific circumstances, it is inappropriate to find force through implication or construction in the case of a sleeping victim.

## *(IV) Applicable Principles of Statutory Construction*

Criminal statutes are to be strictly construed. 1 Pa.C.S. §1928 provides in relevant part:

"§1928. Rule of strict and liberal construction —

"(b) All provisions of a statute of the classes hereafter enumerated shall be strictly construed:

"(1) Penal provisions . . . "

Pennsylvania courts have consistently applied the principles of strict construction to criminal statutes. Thus, penal statutes must be strictly construed, particularly when they impose strict liability. *Commonwealth v. Ashford,* 263 Pa. Super. 100, 397 A.2d 420 (1979). Courts are to construe a criminal statute narrowly, which is to say, in favor of the accused. See e.g., *Commonwealth v. Capitolo,* 324 Pa. Super. 61, 471 A.2d 462 (1984), and the cases cited therein. It has been held that any reasonable construction of a criminal statute is favored, if it operates in favor of life and liberty, *Commonwealth v. Exler,* 243 Pa. 155, 162-3, 89 A.2d 968, 971 (1914), and if two inconsistent constructions of a penal statute are both reasonable, a construction favorable to the accused must be adopted. *Commonwealth v. Teada,* 235 Pa. Super. 438, 344 A.2d 682 (1975). See *Bell v. United States, supra.*

Moreover, the directive of our Supreme Court in *Commonwealth v. Bell,* 512 Pa. 334, 516 A.2d 1172 (1986), is applicable here. Chief Justice Nix writing for the court said:

"The Statutory Construction Act, 1 Pa.C.S. §1501 et seq., provides as its most basic principle that:

" 'When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.' 1 Pa.C.S. §1921(b) (Supp. 1986). *Davis v. Govern-*

*ment Employees Insurance Co.,* 500 Pa. 84, 89, 454 A.2d 973, 975 (1982); *Commonwealth v. Pierce,* 497 Pa. 437, 440, 441 A.2d 1218, 1219 (1982). When the language of a statute is clear and unambiguous, the judiciary must read its provisions in accordance with their plain meaning and common usage. 1 Pa.C.S. §1903(a) (Supp. 1986); [citing cases]. It is not within judicial prerogative to disregard the principles of statutory construction and engage in a selective reading of the purposes behind the . . . law.

"[W]hen the statute's meaning is plain, there is no occasion for resorting to rules of statutory interpretation or looking to the legislative history when doing so would alter the plain meaning of the statute [citing cases.]" *Bell, supra.*

The Crimes Code states that its provisions "shall be construed according to the fair import of their terms but when the language is susceptible of differing construction it shall be interpreted to further the general purpose of [the Crimes Code] and the *special purposes of the particular provisions involved.*" 18 Pa.C.S. §105. (emphasis supplied) The code, moreover, abolished common-law crimes in Pennsylvania. 18 Pa.C.S. §107(b), Common Law Crimes Abolished — no conduct constitutes a crime unless it is a crime under this title or another statute of this commonwealth.[19]

"[T]he enactment of the crimes code abolished common-law crimes." *Commonwealth v. Brown,* 74 D.&C. 2d 724 (1976).

---

19. In this connection, it must be reiterated that both *Stephens, supra,* and *Brown, supra,* were considering what was essentially a common-law crime. The definition of rape in the 1939 codification was substantively identical to the common-law crime of rape. If this were now the case, this court would have no reservation, whatever, finding this defendant guilty of rape.

Finally, it is an established maxim that when construing a statute, an interpretation should *not* be used which would render another section a nullity. The legislature is presumed not to have intended its laws to contain mere surplusage.[20] It is obvious that imputing force as constructive (as suggested by the *Stephens* and *Brown* courts) or implying force in law (as in *Moorman*) would reduce the discrete subsection, section 3121(3), of the rape statute to mere extraneous verbiage.[21] Surely, it was not the intention of our legislature, nor the drafters of the Model Penal Code, to promulgate a statute which contains useless surplusage.

### (V) *The Decision to Arrest Judgment on the Rape Verdict Was Proper in this Case.*

Application of the foregoing principles to the operative facts of this case leads to the conclusion that this court properly arrested judgment on the rape verdict.

The plain meaning of "force" and "forcible compulsion" requires essentially "physical strength, might, violence or intensity of effect" and "the use of force or violence . . . to compel or overpower," respectively.[22]

---

20. See *Turner v. Maryland Corp.*, 285 Pa. Super. 241, 427 A.2d 203 (1981); *Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517 (1977); *Lynch v. Owen J. Roberts School District*, 430 Pa. 461, 244 A.2d 1 (1968).

21. This concern was cited by both the *Kusomoto* and the *Patterson* courts. See *People v. Kusomoto, supra,* at 350; *People v. Patterson, supra,* at 743.

22. The Oxford English Dictionary provides the following definitions:

"*Forcible:* a.1. Done by force, involving the use of force, or violence; esp., in law . . .

"*Force:* n. Strength, power. 1. Physical strength, might or vigour, as an attribute of human beings. 2. As an attribute of

A fair reading of these definitions demonstrates that this defendant's conduct did not constitute "forcible compulsion." Marie's testimony established that when she awoke, she admonished defendant, and he immediately got off her. There simply was no evidence that defendant grabbed her, pushed her down, struck her, threatened her, or exerted any physical force to continue copulating. As discussed above,[23] the distillation of Marie's testimony revealed that once she awoke, the defendant disengaged and stood up. Therefore, the criteria of section 3121(1) and (2) are not met. It follows that the commonwealth's decision to strike the third count (section 3121(3)) from the indictment constituted a fatal flaw in that the evidence presented at trial was insufficient to establish "forcible compulsion." ·

physical action of movements: strength, impetus, violence or intensity of effect. 3. Power or might . . . 5. Physical strength or power exerted upon an object; esp., the use of physical strength to constrain the action of persons; violence or physical coercion . . . (d) In non-material sense: Constraint or compulsion or constraint upon . . . to act under self-constraint and against one's natural impulses. Under a force: Under compulsion. 7. Of things (in non-material or moral relations): Power to influence, affect or control (esp. men in their actions. . . . )

"*Force:* v.[includes] 1. To use violence, ravish (a woman). 2. To press hard upon. . . . 3. To constrain by force (whether physical or moral); to compel; to overcome the resistance of. . . . 4. To compel, constrain or oblige (a person, oneself, etc.) to do a thing. . . .

"*Compulsion:* n. The action, or an act, of compelling, or the condition of being compelled, constraint, obligation, coercion."

"*Compel:* v. 1. To urge irresitibly, to constrain, oblige, force: a. a person to do a thing (the usual constr.). . . . 2.a. To take of get by force, to extort. b. To constrain (an action). . . . 3. To force . . . to drive forcibly. 4. To overpower, constrain."

23. See facts, *supra.* Indeed, Marie twice said that when she woke up, he got off her at once.

The commonwealth argues that the implication that Marie could not herself get up immediately showed there was sufficient force to support the conviction. This testimony, that defendant's legs prevented her from immediately rising, does not establish that force contemplated under section 3121(1). Her inability to get up immediately was merely the result of the force of gravity. Defendant's weight was promptly removed according to the victim. This natural force due to gravity was *not* force used to subdue the victim, and was *not* that "force" contemplated under the statute.[24]

Similarly, the victim's pushing defendant away from her does not translate into the requisite force under the statute. She actually succeeded in pushing defendant from her. If she had tried, and he had forcibly maintained the connection, that may very well have constituted the requisite criminal force. Her pushing defendant manifested her unwillingness, and it was acknowledged by defendant when he removed his penis and arose at once.

The only other force which was arguably present was that required to effect penetration itself. This is not the type of force proscribed by section 3121(1). As stated in *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986), "The 'force' required in this formulation of the crime of rape was not force inherent in the act of penetration but, rather the force actually used or threatened to overcome or prevent resistance by the victim." Such force certainly was absent here.[25]

Finally, two recent Pennsylvania appellate decisions construing the criminal element of "force"

---

24. See *Commonwealth v. Rhodes, infra.*

25. In this regard, it should be noted that the applicable standard jury instruction requires "such force as to *overcome* the resistance of a person of reasonable resolution."

with respect to other crimes are instructive here. In *Commonwealth v. Cook,* 377 Pa. Super. 356, 547 A.2d 406 (1988), the Superior Court held that the force necessary to open an unlocked door did not constitute that "force" required by 18 Pa.C.S. §3503(a)(1)(i) to increase criminal trespass from a felony of the third degree to a felony of the second degree. The court said:

"This required evidence, according to the statute, that appellant had gained entry by 'force' . . . The term force has been defined as '(a) power, violence, compulsion or constraint exerted upon or against a thing. . . . ; (b) strength or power of any degree that is exercised without justification or contrary to law upon a person or thing. . . . ' Webster's Third New International Dictionary (1965). For purposes of the present case, then, the issue is whether opening an unlocked door is sufficient force to increase a criminal trespass from a felony of the third degree to a felony of the second degree.

"After careful consideration, we conclude that it was the intent of the legislature that a criminal trespass involving entry of a building or separately secured portion thereof by opening an unlocked door was punishable as a felony of the third degree. . . . If no force was exercised and no lock was picked, broken, or opened in order to achieve entrance, the more severe punishment was not deemed necessary." *Cook, supra.*

Similarly, in *Commonwealth v. Williams,* 379 Pa. Super. 538, 550 A.2d 579 (1988), the Superior Court held that defendant could not be found guilty of robbery (even though he used force to turn the victim over in order to commit the theft) when the victim was unconscious and not aware of the force used. The *Williams* court stated:

"[T]he phrase 'force however slight' envisions that the victim must be aware of the force, feel compelled to part with his or her property. . . .

"[I]f the victim in this case had been aware of this force, a robbery conviction might have stood based upon the possible distinction between the force used to roll the victim over, and the force used to remove the wallet. However, the victim was not aware of any force in this case; consequently, we find that appellant cannot be guilty of robbery." *Williams, supra.*

In summary, the undersigned does not believe an extensive recapitulation is necessary. Essentially, this court was obliged to construe strictly this rape statute, being mindful that common-law crimes have been abolished in Pennsylvania and that a statutory interpretation is mandated that does not disregard clear and unambiguous language and render a distinct subsection of the rape statute (section 3121(3)) a useless nullity. An interpretation of section 3121(1) which would imply "force" as a matter of law, as in *Moorman, supra,* would render section 3121(3) mere surplusage.

This court finds persuasive the raitonale of the California *(Kusomoto, supra)* and the Michigan *(Patterson, supra)* courts. Application of this rationale and the clear meaning of the term "forcible compulsion" to the operative facts of the instant case obliges a holding that the evidence was insufficient to support a conviction under *those* bills on which the commonwealth proceeded to trial, namely 18 Pa.C.S. §§3121(1), (2) and (4).

*Defendant's Cross-Appeal of the Denial of the
Remaining Post-Verdict Motions and Judgment of
Sentence*

The remainder of this opinion will focus on defendant's cross-appeal at no. 00617 Philadelphia 1989.

In this cross-appeal, defendant advances four basic arguments:

(1) This court erred in failing to require that defendant be arraigned on the charge of incest.

(2) This court erred in failing to charge the jury as to the crime of incest, and/or to instruct the jury that incest is a lesser-included offense of rape and/or indecent assault.

(3) This court erred in its instruction to the jury relative to the crime of indecent assault (section 3126(3)).

(4) There was prosecutorial misconduct of such a nature that a new trial is required.

These contentions will be discussed seriatim.

*(I) The Charging Function is the Province of the
District Attorney. Thus, it Was Proper Not to
Require Arraignment as to the Crime of Incest*

On October 24, 1988, prior to trial, the prosecutor made the decision not to proceed on the charge of incest. This decision was soundly within the discretion of the prosecutor and it was impermissible for this court to intrude upon that power. For this court to have purported so to act by directing the commonwealth to proceed on this bill would have constituted a fundamental violation of the constitutionally mandated separation of powers. Pa. Constitution, Article IV, §4.1; Article V, §5.

This separation-of-powers doctrine was confirmed in *United States v. Torquato,* 602 F.2d 564 (3d Cir.

1979), thusly: "The concept of separation of powers underlies the courts' concern that the prosecutorial function be relatively untrammeled. This is especially true at the incipient states of a prosecution." 602 F.2d at 569.[26] Thus, defendant's contention that it was error for this court to fail to arraign defendant on the charge of incest is meritless.

### (II) Incest is Not a Lesser-Included Offense of Rape or Indecent Assault. Thus, this Court Acted Properly in Refusing so to Charge the Jury.

Defendant urges that it was error not to instruct the jury that incest is a lesser-included offense of rape and/or indecent assault. The test for establishing whether an offense is a lesser-included offense is succinctly stated in *Commonwealth v. Thomas,* 376 Pa. Super. 455, 546 A.2d 116 (1988), "An offense can be considered a lesser-included offense of a charge if each and every element of the lesser offense is necessarily an element of the greater." *Thomas, supra.* See also, *Commonwealth v. Williams,* 299 Pa. Super. 278, 445 A.2d 753 (1982); *U.S. v. Lampley,* 573 F.2d 789 (3d Cir. 1978).[27]

Application of this test demonstrates that incest (18 Pa.C.S. §4302) is not a lesser-included offense of rape or indecent assault. One indispensable element of incest is that the proscribed sexual activity be conducted with a consanguineous person. This element, a relationship within a proscribed familial circle, is not required for a conviction of rape (18

26. See also, *Gockley v. Van Hoove,* 409 F.Supp. 645 (E.D. Pa. 1976).

27. See also the cases cited in *Commonwealth v. Thomas, supra.*

Pa.C.S. §3121) or of indecent assault (18 Pa.C.S. §3126). This contention, therefore, is also without merit.[28]

### (III) This Court's Jury Charge and Instructions Relative to Indecent Assault Were Proper

Initially, it is noted that this court's charge included the standard jury instruction relative to the crime of indecent assault (Instruction 15.3126A, Pennsylvania Suggested Standard Criminal Jury Instructions). This instruction treats fully and unambiguously the law pertinent to an alleged indecent assault. Additionally, it embodies instructions concerning a victim's lack of consent.

This lack of consent language contained within the standard instruction adequately addressed the situation where the victim was unaware of the assault. As discussed previously in this opinion, a victim's ability to manifest consent is inherently at issue when the victim is asleep or unaware. Conversely, a victim who is unaware or asleep is a fortiori not in a position to consent. Therefore, the standard jury instruction for indecent assault, as given, was sufficient, and defendant's assignment of error here is without substance.

It is important to recognize that this court gave the charge on indecent assault, notwithstanding the prosecutor's objection on the ground that indecent assault is a lesser-included offense of rape. See *Commonwealth v. Thomas, supra.* In this regard, this court incorporates here by reference the pertinent transcript.

Moreover, the jury instruction relative to indecent assault was intended to cover not only the incident

---

28. The discussion at November 2, 1988; N.T. 95-9 is incorporated here pusuant to Pa.R.A.P. 1925(a).

of intercourse, but also the three other instances of alleged illegal sexual touching. Marie's testimony disclosed three prior and separate incidents of alleged molestation leading up to intercourse. Thus it was necessary to fashion instructions which spoke to the entire course of conduct, and not merely the incident of alleged intercourse.

Importantly, this court submits that the entire jury charge, taken as a whole, was even-handed and fair in all respects. This is certainly so with respect to those instructions relative to the crimes with which defendant was charged.

Accordingly, this contention of defendant, too, is without merit.[29]

## (IV) Defendant's Allegations of Prosecutorial Misconduct

Analysis of defendant's claims of prosecutorial misconduct requires scrutiny in the alternative; that is, the contentions must be evaluated within two different contexts: (1) assuming that the arrest of judgment as to the rape verdict is affirmed, and (2) assuming that that arrest of judgment is reversed.

If the arrest of judgment as to the rape verdict is affirmed, the prosecutorial misconduct should *not* be deemed fatal with respect to the remaining verdicts, namely, corrupting the morals of a minor and indecent assault. This is because the inflammatory and prejudicial statements made by the prosecutor related almost exclusively to, and would have affected only the jury's consideration of the rape charge. The undersigned submits that, in this in-

29. The January 27, 1989 transcript pertinent to consideration of the defendant's post-verdict motions is incorporated here under Pa.R.A.P. 1925(a).

stance, the judgments of sentence as to corrupting the morals of a minor and indecent assault should be affirmed.

If, on the other hand, the arrest of judgment as to the rape verdict is reversed, this court believes that the prosecutor's statements during closing argument were so inflammatory and prejudicial as to have had the unavoidable effect rendering the jury incapable of objectively weighing the evidence and delivering an impartial verdict as to the *rape* charge. In this instance, the undersigned believes that, in the interest of justice, a new trial should be granted *only* with respect to the charge of rape.

There are three areas of the prosecutor's closing challenged by defendant. Although, standing alone, each may not be so serious as to require a new trial (assuming the arrest of judgment on the rape verdict is reversed), this court submits that the potent distillation of their combined effect denied defendant a fair trial in that it unavoidably prejudiced the jury to such an extent that the jury could not weigh the evidence objectively and render an impartial verdict *as to the rape charge*.[30]

Defendant first contends that the prosecutor's references to the authority position of defendant-father as an inherent force were prejudicial and prohibited by this court's in limine ruling.[31] While

---

30. It should be reiterated that this court believes that the prosecutorial misconduct affected only the jury's ability to consider impartially the evidence pertinent to the rape charge. The misconduct did not apply to that evidence the jury was to consider in reaching a verdict on the corrupting the morals of a minor or the indecent assault charges.

31. It was determined during trial that this case did not involve the psychological, moral, intellectual or emotional force discussed in *Rhodes, supra.* Thus, the prosecutor was advised that such an argument would be inappropriate and cautioned not to resort to it.

such statements may have been improper and disturbing to this court, they *alone* were not of such a nature as to prejudice the jury. Certainly, they did not have a cognizable effect on the jury's ability to consider objectively the charges of corrupting the morals of a minor and indecent assault.

As to the rape charge, the remarks concerning the defendant's relationship as an inherent force were made in the context of the prosecutor's argument that the intercourse was completed through force. Although these statements came close to being within the prohibited scope of the *Rhodes* material, if scrutinized closely, they were not in violation of the court's in limine determination. *Rhodes, supra,* speaks to psychological, moral and/or intellectual force in circumstances where such was used or threatened. *Rhodes, supra.* The district attorney characterized the paternal relationship as one of inherent force, not threatened force or force actually applied. Simply arguing that there is a force component inherent in the father-daughter relationship does not compel the conclusion that the inherent force derived from that authority was exercised or was operative in effecting the rape. It is a delicate distinction, but one which results in these complained of comments, *standing alone,* being non-violative of this court's in limine directive.

However, the undersigned believes it is a close question, and in the event that this court's arrest of judgment as to the rape verdict should be reversed, these comments coupled with the other unwarranted statements were so prejudicial as to warrant a new trial.

Second, defendant asserts that the prosecutor made a prejudicial and improper emotional appeal to the jury in an attempt to inflame the jury to the point that sympathy for the victim would prevent

the jury from rendering an objective verdict based only on the evidence. These remarks included statements reiterating the victim's cries of "Daddy is messing with me. Daddy is messing with me. Help me. Why do you have to mess with me? Why do you have to mess with me?"

The applicable test to evaluate such comments was set forth in *Commonwealth v. Riggins,* 374 Pa. Super. 243, 542 A.2d 1004 (1988) and in *Commonwealth v. D'Amato,* 514 Pa. 471, 526 A.2d 300 (1987). Under this test, a prosecutor's statements do not constitute reversible error unless the unavoidable effect of the comments is to so prejudice the jury as to render it incapable of weighing the evidence objectively and delivering a true verdict. Further, such comments must be evaluated in the context in which they are made, and prosecutors must be afforded latitutde to reasonably and fairly argue the case with logical force and vigor. See *Commonwealth v. Williams,* 346 Pa. Super. 456, 499 A.2d 1089 (1985); *Commonwealth v. Smith,* 490 Pa. 380, 416 A.2d 986 (1980).

In light of these principles, this court is not persuaded that these statements *alone,* were so prejudicial that they denied defendant a fair trial. The prosecutor's reiteration of Marie's testimony was merely to quote the victim. The jury had already heard these words from Marie which, undoubtedly, had been more forceful and unsettling. Thus, this court does not believe that this restatement of testimony was sufficient to prejudice the jurors to the extent that they would be incapable of rationally weighing the evidence and delivering a considered verdict. As in the prior instance, this challenged conduct clearly did *not* preclude a fair trial on the charges of corrupting the morals of a minor and indecent assault.

Moreover, the jury was properly cautioned *not* to be swayed by, or reach a verdict based upon *sympathy*. Indeed, this court highlighted this point given the nature of the charges and the relationship of the persons involved, both prior to the commencement of testimony and prior to the jury's deliberations. Thus, these statements — by themselves — do not meet those criteria which would require the granting of a new trial. Again, however, when coupled with the other challenged conduct, the overall effect warrants a new trial *on the rape charge (if the arrest of judgment* as to that rape verdict *is* to be *reversed).*

We now turn to the third and most troubling of the prosecutor's statements challenged by defendant. The prosecutor stated, "This . . . as sure as if he put a gun to her head is rape . . . rape." Arguably this statement was merely an aspect of the commonwealth's argument that force was inherent in the relationship, and the circumstances existing between defendant-father and daughter-Marie. It was clear to the undersigned — that would, it is submitted, have been clear also to the jury — from the context within which it was made, that the statement pertained only to the commonwealth's fervent belief that the rape charge had been proven beyond a reasonable doubt. Conversely, its was not intended, nor was it understood by the jury, to apply to the corrupting the morals of a minor or the indecent assault charges.

This "gun to her head" statement was apparently an attempt to bolster the argument, albeit a questionable one, that the inherent force present due to the relationship and the circumstances was force sufficient under 18 Pa.C.S. §3121. The statement was made as part of this overall argument stressing

inherent force, which included other statements such as "he doesn't need a gun. He doesn't need a knife."

It must be emphasized that during two days of testimony, there was *no evidence whatever* suggesting that a gun, a knife, or any weapon for that matter, had been employed by defendant at any time during the entire course of his conduct. Nor was the prosecutor's argument that such inherent force was, in fact, applied fairly based on the facts presented. In this regard, these statements were also inappropriate pursuant to this court's in limine ruling that the *Rhodes* factors were *not* involved and were *not* to be argued.[32] Marie was asleep when penetration was instituted and, after she awoke, there was no force — actual, implied, or inherent (psychological, moral, intellectual or otherwise) — testified to as having been exerted to maintain or continue the intercourse. The prosecutor also knew that this court had ruled that the concept of applied inherent force was *not* part of the case and would not be defined or referenced by this court in its jury instructions. Thus, there was no intellectually honest reason to stress these concepts, let alone mention weapons on at least two occasions.

In summary, this court believes that the subtle, but telling, effect of the combination of these three instances of misconduct[33] was to deny the defendant a fair trial with respect to the *rape charge only*.

In reaching the above conclusions, this court is mindful of those appellate decisions which have analyzed incidents of alleged prosecutorial miscon-

32. See discussion, footnotes 4 and 31, *supra*.

33. In this regard, the undersigned recommends that the entire commonwealth closing be considered. It is set forth at November 3, 1988; N.T. 34-54, and is incorporated herein by reference.

duct. For example, in *Commonwealth v. Burton,* 491 Pa. 13, 417 A.2d 611 (1980), the Supreme Court advised:

"Even where the language of the prosecuting attorney is intemperate, uncalled-for and improper, a new trial is not required unless its unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant, so that they could not weigh the evidence and render a true verdict." 491 Pa. at 22, 417 A.2d at 615. And, in *Commonwealth v. Pinder,* 310 Pa. Super. 56, 456 A.2d 179 (1983), the court reminded:

"A prosecutor is free to argue that the facts and reasonable inferences to be drawn [from given circumstances] are sufficient. . . . " 310 Pa. Super. at 68, 456 A.2d at 185.

Here, however, it is submitted that the prosecutor argued facts not in evidence and asked the jury to draw totally inappropriate inferences. Furthermore, because of the real possibility that the jury will give special weight to a prosecutor's arguments due to the prestige associated with his office, and because of the fact-finding facilities available to him, the prosecutor in his closing address must present only a "disinterested, impartial and fair assessment of the testimony." *Commonwealth v. Harvell,* 458 Pa. 401, 411, 327 A.2d 27, 30 (1974); *Commonwealth v. Van Cliff,* 483 Pa. 576, 397 A.2d 1173 (1979). In this regard, in *Commonwealth v. Brooks,* 362 Pa. Super. 236, 523 A.2d 1169 (1987), Superior Court recently reiterated:

"[B]ecause of the very nature of the prosecutor's position, any facts testified to by a district attorney are likely to be accorded great weight by the average jury."

In this case, the prosecutor did *not* present an

impartial and fair assessment of the testimony relative to the rape charge. Further, the combination of these instances of prosecutorial misconduct had, in this court's judgment, the unavoidable effect of so prejudicing the jury that it precluded the jury from objectively weighing the evidence pertinent to the rape charge and rendering an impartial verdict.

## CONCLUSION

For the reasons set forth above, as to the commonwealth's appeal at no. 00616 Philadelphia 1989, the arrest of judgment as to the rape verdict should be affirmed.

Similarly, for the above reasons, as to defendant's appeal at no. 00617 Philadelphia 1989, the judgments of sentence with respect to the corrupting the morals of a minor and the indecent assault should be affirmed.

## ADDENDUM TO OPINION

SHEPPARD, *J.*, April 21, 1989 —

## INTRODUCTION

This addendum is submitted to supplement pertinent portions of this court's opinion, filed April 4, 1989, in light of the recent decision of Superior Court in *Commonwealth v. Titus*, no. J. 81043/88, slip op. (Superior Court, March 29, 1989, no. 1127PHL88). (The opinion filed in *Commonwealth v. Titus, supra,* was not available to the undersigned when the opinion in the instant matter was filed.)

The decision of the *Titus* court presents factual similarities, legal analyses, and dicta which bear upon, comport with or highlight certain aspects of this court's rationale in reaching its decision. The

pertinent portions of this court's opinion implicated by the *Titus* decision are referenced by brackets in section II(C) of this addendum.

## DISCUSSION

### *Facts in Commonwealth v. Titus, Supra*

*Commonwealth v. Titus, supra,* involved a defendant-father who engaged in intercourse with his 13-year-old daughter. Defendant returned home from a night of drinking, got into bed with his sleeping daughter and, after she awoke, proceeded to have intercourse with her. The girl then pushed him away, after which he left her alone. The testimony of the daughter demonstrated that she did not consent and that she tried to push defendant away, but *only after* intercourse had occurred. The daughter did *not* testify to any actual physical force or threat of force having been exerted by the defendant.

The defendant was convicted in a non-jury trial of rape under 18 Pa.C.S. §3121. He appealed, arguing that there had been no evidence of forcible compulsion or threat of forcible compulsion and, therefore, the evidence was insufficient to support a conviction under the statute.

### *The Superior Court Decision in Commonwealth v. Titus, Supra*

The Superior Court in *Titus, supra,* reversed, vacating the judgment of sentence and arresting judgment on the charge of rape. The court, after evaluating the testimony in the light most favorable to the commonwealth, concluded that defendant "did not use actual physical force, or the threat [of force] against the victim" (J. 81043/88 at 4). Recognizing that the trial court had relied on an inference that the

"father-daughter relationship created a psychological and emotional atmosphere in which the victim was prevented from resisting," the Superior Court turned for guidance to the seminal case of *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217 (1986).

After analyzing *Rhodes, supra,* and its progeny,[34] the *Titus* court concluded that the mere fact of a father-daughter relationship, without more, is *not* enough to establish the moral, psychological, or intellectual force sufficient to sustain a conviction of rape (J. 81043/88 at 9-10). Absent a showing that other factors (such as: past or present physical abuse, threats, removal to a remote and unfamiliar locations, fear of breaking up a family, or the victim's extreme youth) combined with the parent-child relationship to create forcible compulsion, the evidence of that relationship, standing alone, was deemed insufficient to prove rape by forcible compulsion or a threat thereof.

Moreover, the *Titus* court found that the trial court's reliance on the father-daughter relationship *alone* to find the requisite force, impermissibly extended the holding of *Rhodes, supra,* beyond existing bounds of case law. Simply showing lack of consent and the mere relationship was not enough. In this regard, the *Titus* court cited the relevant statutory provisions and reasoned that,

"[I]f the legislature had intended the mere existence of a parent-child relationship, without more, to constitute 'forcible compulsion' or the 'threat of forcible compulsion that would prevent resistance by a person of reasonable resolution,' such a presumption could have been written into the Crimes Code. ... The absence of any such legislative

34. See J. 81043/88 at 6-9.

presumption argues against its establishment by judicial fiat." J. 81043/88 at 10-11.

In its summary, the *Titus* court reiterated that the commonwealth had not proven the requisite "force" element beyond a reasonable doubt. Absent was evidence of force — whether moral, psychological, intellectual or physical — sufficient to sustain the rape verdict.

### *Applicability of Commonwealth v. Titus, Supra, to the Instant Matter* [35]

The facts of *Titus,* especially that after the daughter awoke, there was no showing of actual force or threat of force, are analogous to the instant matter. [See Facts, pages 633-4.]

The analysis of *Commonwealth v. Rhodes, supra,* and its progeny by the *Titus* court should be viewed as supportive of this court's assessment of the relevance of the *Rhodes* decision in this case. [See footnote 4, page 653, pages 660-1, and footnote 32.]

Important was the *Titus* court's re-emphasis of the need to show beyond a reasonable doubt actual physical force or the threat of it to sustain a conviction under 18 Pa.C.S. §§3121(1) or (2). The fair inference that arises from *Titus* is that the mere pushing away of the perpetrator by the victim, or the force of gravity alone or the penetration itself does not constitute the force proscribed by 18 Pa.C.S. §3121(1). [See discussion at pages 652-3, and footnotes 22 and 25.]

Also of moment was the reference by the *Titus* court to the rape statute itself to determine the legislative intent in assessing the "force" element of that statute. [See discussions at pages 644-6 and 649-51.]

35. As noted, those portions of this court's opinion (filed April 4) pertinent to this addendum are set forth in brackets.

The decision in *Titus, supra,* also pertains to the evaluation of the assignments by defendant of alleged prosecutorial misconduct. The holding of the *Titus* court, that there is no inherent force, qua force, derived solely from the parent-child relationship, renders more troublesome the prosecutor's improper reliance on the "inherent force" and the "relationship itself" closing arguments. [See discussions at pages 660-1 and 663-4.]

Further, it is instructive to note that the *Titus* court arrested judgment as to the rape charge only and let stand the remaining charges, remanding for resentencing on those charges. Since this court sentenced specifically on the remaining charges (i.e., corrupting the morals of aminor and indecent assault), it is submitted that the arrest of judgment of the rape verdit in this case can be affirmed while, at the same time, the judgments of sentence on the remaining two charges may be affirmed.

Finally, the *Titus* court, even though it felt obliged to arrest judgment on the rape, noted that the father's "conduct in engaging in sexual relations with his 13-year-old daughter [was] abhorrent and fully merited the punishment attendant upon conviction of . . . the other offenses." J. 81043/88 at 12. This court, too, was upset by the abhorrent conduct of this defendant (also a natural father having intercourse with his 13-year-old daughter) and imposed the maximum sentences permitted on the remaining verdicts. [See discussion at page 636.]

## CONCLUSION

In summary, the undersigned submits that the recent decision in *Commonwealth v. Titus, supra,* constitutes additional authority for this court's position that the judgments should be affirmed.